[Cite as *State v. Benitez*, 2019-Ohio-4634.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## JEFFERSON COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

EMILIANO BENITEZ,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 18 JE 0016

---

Criminal Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 18-CR-68

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Jane M. Hanlin*, Jefferson County Prosecutor and *Atty. Edward Littlejohn Jr.* Assistant Prosecutor, Jefferson County Justice Center, 16001 State Route 7, Steubenville, Ohio 43952, for Plaintiff-Appellee and

*Atty. Eric Reszke,* Suite 810, Sinclair Building, 100 North 4th Street, Steubenville, Ohio 43952, for Defendant-Appellant.

Dated: November 7, 2019

────────────────

**D'APOLITO, J.**

{¶1} Appellant, Emiliano Benitez, appeals from the July 26, 2018 judgment of the Jefferson County Court of Common Pleas sentencing him for felonious assault following a jury trial. On appeal, Appellant asserts that the guilty verdict is against the manifest weight of the evidence and that his seven-year sentence is contrary to law. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2} On May 2, 2018, Appellant was indicted by the Jefferson County Grand Jury on two counts: count one, aggravated burglary, a felony of the first degree, in violation of R.C. 2911.11(A)(1); and count two, felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1). Appellant was appointed counsel and pleaded not guilty at his arraignment.

{¶3} A jury trial was held on July 24, 2018.

{¶4} Appellee, the State of Ohio, presented five witnesses: Officers Kohl Liddick, James Lackey, and Gary Slates, all with the Jefferson County Sheriff's Office; James Hanlin, the victim; and Sharon Whitman, Appellant's former girlfriend.

{¶5} This case arose out of a love triangle involving Appellant, Hanlin, and Whitman. Whitman resided at 110 Worthington Street in Amsterdam, Ohio. Appellant had lived with her. However, on March 19, 2018, Appellant was no longer welcome to reside in Whitman's home. Appellant left, took his personal effects, and left a house key on a table.

{¶6} A week later, Appellant returned. He asked Whitman to fix his cell phone. Whitman told Appellant not to come back to her residence. She mentioned that she would not help him in any way from that day forward. Appellant left. Whitman was unaware of where he went to live.

{¶7} Appellant and Whitman continued to communicate with each other via text messaging. According to Whitman, while she was texting with Appellant on April 2, 2018, she notified him that she had a new live-in paramour, James Hanlin. Appellant could not

believe Whitman had moved on to another romantic relationship. Appellant told Whitman he intended to beat up and kill Hanlin. Whitman informed Appellant that she would be heading to her home with Hanlin. Appellant responded with another threat on Hanlin's life. Whitman then had a telephone conversation with Appellant in an attempt to calm him down. Appellant was screaming and yelling. Whitman hung up.

{¶8} Thereafter, Appellant showed up at Whitman's residence. At the time of his arrival, Whitman was sitting on her bed with Hanlin. Appellant knocked on the door to her trailer. Whitman went outside. Appellant wanted to go inside. She told him to leave. She did not permit Appellant to enter her home. According to Whitman, Appellant stated multiple times that he intended to kill Hanlin. Appellant asked Whitman if they could be romantically involved again if he killed Hanlin. Whitman informed Appellant that she did not want to continue a relationship with him. Whitman testified that Appellant reached into his pocket, pulled out a knife, and put the knife to her neck. Appellant demanded entrance into her residence. Whitman refused and again asked him to leave. Appellant left. Whitman testified she was not afraid when Appellant pulled out the knife and did not believe he would harm her.

{¶9} Appellant returned to Whitman's residence. She again met him outside. Whitman testified that Appellant then began banging on her windows repeatedly. After he left, Whitman took a bath. While in the tub, she heard a "big sound." (7/24/18 Jury Trial T.p. 121). She got out of the tub and began walking through her trailer looking for an intruder. She did not see anyone. Whitman declared that Appellant then hit her kitchen window with a flashlight, smiled at her, and said "'I'm right here, Baby.'" (*Id.*) Whitman called 911.

{¶10} Whitman believed that something bad was about to happen. She testified that Appellant's demeanor changed. Whitman declared that Appellant went from "'I'm frustrated, this life sucks,'" to "'I'm changing the way things are going. I will do whatever I have to do to get you back.'" (T.p. 121). She spoke with Appellant through the window while on the telephone with the 911 operator. She advised the operator that Appellant was outside her window staring at her. Whitman told Appellant that she was on the phone with law enforcement. She asked him to stop his actions. Appellant declared that Whitman's trailer was his home and that he did not intend to leave. Whitman indicated

that Appellant took the flashlight from his face, kicked in the air conditioner affixed to the window, and began to enter her residence.

{¶11} Once inside, Whitman testified that Appellant told her to step aside so he could kill Hanlin. Whitman reached for Appellant's hands. She stated that Appellant backed up and grabbed a butcher knife from the kitchen sink. Whitman testified that Appellant said, "'Baby, I love you. I need you to move so I can kill him please.'" (T.p. 123). Whitman told Hanlin to run. Hanlin began running and Appellant chased after him.

{¶12} Whitman testified that she heard Appellant grunt and observed him swinging his arm. She believed Hanlin was being stabbed. Whitman went outside and grabbed Appellant. Appellant stated, "'[t]his one's for you'" as he stabbed Hanlin on the left side of his body. (T.p. 124). At that point, the handle on the knife broke and Appellant threw it down. Whitman grabbed Appellant again and told him to stop. Whitman again told Hanlin to run. Appellant pushed Whitman away and began to run after Hanlin.

{¶13} Hanlin testified that he knew Whitman all her life. He did not know Appellant. On the date of the incident, Hanlin was initially with Whitman at her daughter's home where she was babysitting her grandchildren. The couple left and drove to Whitman's trailer. Hanlin stated he was in the living room and that Whitman went outside to talk with Appellant after he had arrived. Appellant banged on the window and threatened to kill Hanlin. Hanlin could not hear the conversation between Whitman and Appellant.

{¶14} After Whitman came back inside, Hanlin advised her to call law enforcement. Hanlin observed Appellant enter the trailer through a window. Once inside, Appellant told Whitman he loved her. Appellant proceeded to the kitchen where he grabbed a butcher knife. Appellant directed Whitman to get out of his way so that he could kill Hanlin. Hanlin testified that Appellant stabbed him multiple times on the porch.

{¶15} Hanlin ran from the residence and into the woods. He lost consciousness due to blood loss. Hanlin eventually regained consciousness. He heard the voices of law enforcement at Whitman's home. Hanlin was taken to the hospital where he received treatment for his injuries. Hanlin had permanent scarring as a result of the multiple stabbings and received 24 stitches.

{¶16} Both Whitman and Hanlin denied taunting or provoking Appellant in any manner. Whitman denied having an aluminum baseball bat at her residence and Hanlin denied seeing a bat at her home.

{¶17} Officer Liddick responded to Whitman's residence. He was accompanied by Sgt. Pfouts of the Jefferson County Sheriff's Department as well as several troopers from the Ohio State Highway Patrol. Once Whitman's safety was assured, they began to search for Appellant and secured the perimeter. Hanlin eventually emerged from the surrounding wood-line. Officer Liddick was informed by Whitman that entry to the residence was gained through a window after Appellant pushed in an air conditioning unit. Officer Liddick confirmed Whitman's account by observing an air conditioner unit upright on the floor. It appeared to have been pushed into the home from the outside.

{¶18} Officer Liddick proceeded outside. He observed wooden pallets stacked below a window. He observed a knife blade and a broken handle on the front porch, which were collected as evidence. Photographs were taken of the scene as well as the injuries sustained by Hanlin. Officer Liddick testified that Hanlin's shirt and jacket were also seized during the investigation. Officer Liddick did not observe a baseball bat at the scene. No fingerprints were collected.

{¶19} On cross-examination, Officer Liddick could not state that the air conditioner was not moved from the time of the 911 call to the arrival of law enforcement. He did not observe damage to the window where the air conditioner unit was allegedly pushed into the residence. Officer Liddick agreed that the window frames in mobile homes are typically cheaply constructed with aluminum. Officer Liddick also agreed that if an air conditioning unit was pushed in from the outside there would be some damage to the window frame. He further agreed that there should have been damage to the air conditioner. He admitted to seeing no damage.

{¶20} Officer Lackey became involved in the investigation on April 4, 2018. The Sheriff's Department received a call that Appellant had just left Clark's Gas Station in Amsterdam. Appellant was allegedly living in a camper behind 110 Worthington Street. Officer Lackey, along with other deputies, responded to the area and approached the camper. The deputies knocked and announced their presence. There was no response. The door was secured. Officer Lackey broke a window. At that point, Appellant came

out of the camper. Appellant wished to speak to law enforcement in regard to the April 2 incident. Officer Lackey advised him to wait until they arrived at the Justice Center. Officer Lackey took Appellant to jail and interviewed him, after giving Appellant his *Miranda* warnings.

**{¶21}** During the interview, Appellant admitted to stabbing Hanlin but claimed that Hanlin and Whitman mocked him. Appellant stated he went to Whitman's residence to assault Hanlin. Appellant said Hanlin fought back with a baseball bat. Appellant was unaware of where he dropped the knife. He ran when Whitman said she was calling the police. Appellant said he was angry and cannot remember what he did.

**{¶22}** Officer Slates manages and secures evidence in criminal investigations. He testified as to the collection and recovery of the shirt and hoodie belonging to Hanlin. Officer Slates testified that both items had holes in the same left back area. He also testified that a knife and a separate handle were recovered from the scene by law enforcement.

**{¶23}** At the close of the State's case, defense counsel moved for an acquittal pursuant to Crim.R. 29 on the aggravated burglary charge. The trial court lessened the charge to burglary, a felony of the second degree, in violation of R.C. 2911.12(A)(1).

**{¶24}** Appellant did not testify nor did he present any defense witnesses.

**{¶25}** The jury found Appellant not guilty of burglary and guilty of felonious assault, as contained in count two of the indictment.

**{¶26}** On July 26, 2018, the trial court sentenced Appellant to seven years in prison for felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1), and advised him that post-release control is mandatory for a period of three years. Appellant filed a timely appeal and raises two assignments of error.

### ASSIGNMENT OF ERROR NO. 1

**THE JURY VERDICT OF GUILTY TO FELONIOUS ASSAULT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather

than the other." (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis deleted.) *Id.*

When reviewing a manifest weight of the evidence argument, a reviewing court must examine the entire record, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387, 389. Only in exceptional circumstances will a conviction be reversed as against the manifest weight of the evidence. *Id.* This strict test for manifest weight acknowledges that credibility is generally the province of the factfinder who sits in the best position to accurately assess the credibility of the witnesses. *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

*State v. Yetts*, 7th Dist. Jefferson No. 18 JE 0004, 2019-Ohio-1203, ¶ 12-13.

**{¶27}** As stated, Whitman was romantically involved with Appellant. In March 2018, Whitman broke things off. The following month, Whitman notified Appellant that she had a new live-in boyfriend, Hanlin. Appellant did not take the news well. According to Whitman, Appellant told her that he intended to beat up and kill Hanlin. Thereafter, Appellant went uninvited to Whitman's home at different times. Whitman ultimately called 911. Whitman testified that Appellant grabbed a butcher knife, told her that he loved her, and ordered her to step aside so that he could kill Hanlin. Following a chase, Appellant stabbed Hanlin multiple times. Appellant threw the knife down after the handle broke. Hanlin indicated that he had permanent scarring as a result of the multiple stabbings and that he received 24 stitches.

**{¶28}** During the interview at the police station, Appellant admitted to stabbing Hanlin but claimed that Hanlin and Whitman mocked him. At trial, both Whitman and Hanlin denied taunting or provoking Appellant in any manner.

**{¶29}** The jury chose to believe the State's witnesses. *DeHass, supra*, at paragraph one of the syllabus. Based on the evidence presented, the jury did not clearly lose its way in finding Appellant guilty of felonious assault. *Thompkins, supra*, at 387.

**{¶30}** Appellant's first assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN SENTENCING THE DEFENDANT TO SEVEN (7) YEARS IN PRISON.**

**{¶31}** This court utilizes R.C. 2953.08(G) as the standard of review in all felony sentencing appeals. *State v. Michaels*, 7th Dist. Mahoning No. 17 MA 0122, 2019-Ohio-497, ¶ 2, citing *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1.

**{¶32}** R.C. 2953.08(G) states in pertinent part:

(2) The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

**{¶33}** Although trial courts have full discretion to impose any term of imprisonment within the statutory range, they must consider the sentencing purposes in R.C. 2929.11 and the guidelines contained in R.C. 2929.12.

**{¶34}** R.C. 2929.11(A) provides that the overriding purposes of felony sentencing are (1) "to protect the public from future crime by the offender and others"; and (2) "to punish the offender * * * using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." Further, the sentence imposed shall be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B).

**{¶35}** R.C. 2929.12 provides a nonexhaustive list of sentencing factors the trial court must consider when determining the seriousness of the offense and the likelihood that the offender will commit future offenses. The court that imposes a felony sentence "has discretion to determine the most effective way to comply with the purposes and principles of sentencing." R.C. 2929.12(A). The factors a trial court may consider include the "more serious" factors, such as "[t]he physical or mental injury suffered by the victim of the offense due to the conduct of the offender was exacerbated because of the physical or mental condition or age of the victim" and "[t]he victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense." R.C. 2929.12(B)(1) and (2). The court may also consider the "less serious" factors, any recidivism factors, and any mitigating factors listed in R.C. 2929.12(C)-(F).

> R.C. 2929.11 does not require the trial court to make any specific findings as to the purposes and principles of sentencing. *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 31. Similarly, R.C. 2929.12 does not require the trial court to "use specific language or make specific findings on the record in order to evince the requisite consideration of the applicable seriousness and recidivism factors." *State v. Arnett*, 88 Ohio St.3d 208, 215, 724 N.E.2d 793 (2000).

*State v. Shaw*, 7th Dist. Belmont No. 15 BE 0065, 2017-Ohio-1259, ¶ 36.

Case No. 18 JE 0016

{¶36} At the sentencing hearing, the trial court heard from the attorneys and from Appellant; indicated that it reviewed and considered Appellant's prior convictions; and referenced the victim. The trial judge proceeded by stating the following:

> I think the minimum sentence would demean the seriousness of the offense. Had the knife not broken I think the victim would have been dead. I think the – the knife breaking is what saved him. So, I think that makes it much more serious than it otherwise would have been. It's still not the most serious form of the offense because we have felonious assaults where victims are – are seriously disabled for life and that didn't happen in this case and I think that's the worst form of the offense but this one is right up there because really had the knife not broken I think he would have been dead.
>
> So, I think where we are here is we are going to do 7, 7 years in prison because it's just shy of the worst form of the offense.

(7/25/18 Sentencing T.p. 4-5).

{¶37} Also, in its July 26, 2018 judgment entry, the trial court stated that it "considered the record, oral statements and the victim impact, as well as the Purpose and Principles of sentencing under R.C. 2929.11, and has balanced the seriousness and recidivism factors under R.C. 2929.12 all discretionary and non-mandatory factors." (7/26/18 Judgment Entry p. 1). The court further stated in its entry:

> The minimum sentence would demean the seriousness of this offense and not protect the public by reason of the seriousness of this offense. Here, [Appellant] stabbed and slashed the victim multiple times with a long heavy bladed butcher knife that broke during the Assault. Had the handle not broken off of the knife the victim would have been killed.

(7/26/18 Judgment Entry p. 2).

{¶38} Accordingly, the record reflects the trial court gave due deliberation to the relevant statutory considerations. The court considered the purposes and principles of

felony sentencing under R.C. 2929.11 and balanced the seriousness and recidivism factors under R.C. 2929.12, as evidenced from the record.

**{¶39}** As stated, Appellant was sentenced to a total of seven years in prison following a jury trial for felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1). Thus, the court sentenced Appellant within the statutory range under R.C. 2929.14(A)(2)(b) ("For a felony of the second degree * * * the prison term shall be a definite term of two, three, four, five, six, seven, or eight years.")

**{¶40}** Further, the record reveals the trial court properly advised Appellant regarding post-release control. Therefore, the court complied with all applicable rules and statutes. As a result, we do not find by clear and convincing evidence that the record does not support Appellant's sentence or that the sentence is contrary to law.

**{¶41}** Appellant's second assignment of error is without merit.

## CONCLUSION

**{¶42}** For the foregoing reasons, Appellant's assignments of error are not well-taken. The judgment of the Jefferson County Court of Common Pleas convicting Appellant for felonious assault following a jury trial and sentencing him to seven years in prison is affirmed.


Donofrio, J., concurs.

Robb, J., concurs.


Case No. 18 JE 0016

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**